AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>Target Account, as more fully described in )<br>Attachments A and B )<br> ) | Case No.   MJ21-469 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C § 2314 | Interstate or international transportation of stolen goods |

The application is based on these facts:

✓  See Affidavit of Special Agent Joshua Anderson, continued on the attached sheet.

☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or ☐ telephonically recorded.

_____
*Applicant's signature*

Joshua Anderson, FBI Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____ 08/12/2021 _____

_____
*Judge's signature*

City and state:  Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

USAO# 2021R00182

# ATTACHMENT A

## Account to Be Searched

This warrant applies to information associated with the Facebook user Tran Nguyen, user ID number 10000162411278, that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to Be Seized

### I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

#### A.    The following information about the customers or subscribers of the account:

a.    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from January 1, 2019 until February 28, 2020;

c.    All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them from January 1, 2019 until February 28, 2020, including Exchangeable Image File (EXIF") data and any other metadata associated with those photos and videos;

d.    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

f.    All other records and contents of communications and messages made or received by the user from January 1, 2019 until February 28, 2020, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

g.      All "check ins" and other location information;

h.      All IP logs, including all records of the IP addresses that logged into the account;

i.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j.      All information about the Facebook pages that the account is or was a "fan" of;

k.      All past and present lists of friends created by the account;

l.      All records of Facebook searches performed by the account from January 1, 2019 until February 28, 2020;

m.      All information about the user's access and use of Facebook Marketplace;

n.      The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

o.      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 2314 (interstate or international transportation of stolen goods) involving Tran Nguyen from January 1, 2019 until February 28, 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

a.      Evidence pertaining to Nguyen's transportation of stolen goods, including her purchase, storage, and shipping of formula products; communications with others who facilitated her acquisition, sale, and transportation of those products; and payments sent and received in connection with those products;

b.      Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

c.      Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

d.      Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**AFFIDAVIT**

STATE OF WASHINGTON          )

                             )     ss

COUNTY OF KING               )

I, Joshua Anderson, a Special Agent with the Federal Bureau of Investigation, Seattle, Washington, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for the past eleven years.  I am currently assigned to the Seattle Field Division of the FBI, and investigate cases involving organized crime.  I have received basic federal law enforcement training, including training at the FBI Academy, as well as other specialized federal law enforcement training. In the course of my official duties as a Special Agent, I have investigated a broad range of transnational organized crime, involving international theft and sale of stolen products originating from shoplifting of products, stolen products being sold both in person and online, retail crime rings and other organized crime occurring both domestically and internationally. I have experience with methods and practices used by persons engaged in organized crime and money laundering, and I have an understanding of the motivations and methods of operating of both individuals and groups.

2.      During my employment as a Special Agent, I have gained experience with the use of a variety of law enforcement techniques, including the following: analysis of financial, business, and e-mail records; analysis of banking records; interviews of witnesses, including cooperators; undercover operations; consensual recordings; physical surveillance techniques; and execution of search warrants.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, public records, publicly viewable information on social media websites, and information derived from reliable source reporting and undercover transactions conducted by retired, career law enforcement officers, as well as my own personal knowledge in review of such materials produced from their reports and transactions.   This

Affidavit of Joshua Anderson - 1
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of this matter.  Unless specifically indicated otherwise, all conversations and statements in this affidavit are related in substance and part only.

## PURPOSE

4.      I make this Affidavit in support of an application for a search warrant for information associated with the Facebook username "Tran Nguyen" ("SUBJECT ACCOUNT"), with Facebook ID number 100001626411278, that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

5.      This warrant was originally sworn out and signed by Magistrate Judge Paula L. McCandlis on February 28, 2020 at 11:00 am. However, due to an oversight I never executed the warrant, so I am now requesting the reissuance of this warrant. I have included additional information that has occurred during the investigation since the last application in paragraphs thirty-four to forty-two.

## SUMMARY OF PROBABLE CAUSE

6.      As outlined below, there is probable cause to believe that Tran NGUYEN is the user of the SUBJECT ACCOUNT and that she, along with others, has been committing violations of Title 18, United States Code, Section 2314 (interstate or international transportation of stolen goods).

Affidavit of Joshua Anderson - 2
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

7.      In January 2019, Albertsons Companies, Inc., the parent company for Safeway, Inc. (collectively, "Safeway"), launched an investigation into annual loss from company stores in the Pacific Northwest from the theft of stolen goods, with a focus on infant formula and related products.  Safeway estimates that, in 2018 alone, stores in Washington and Oregon lost millions of dollars from the theft of formula products.  According to the company's investigation, thieves often steal formula products directly from grocery stores and sell them at a fraction of retail value to black marketers, or "fences."  Typically, the fences turn a profit by selling the stolen goods for a markup that is still well below retail value, both domestically and internationally.

8.      To assist with this investigation, Safeway hired private investigators, who would often portray themselves on the online buying/seller platform "OfferUp" as discount resellers of infant formula.  OfferUp is a website and mobile smartphone application that allows individuals to post advertisements for merchandise.  The OfferUp platform has its own messaging system, which allows users to send and receive communications without using their personal phone numbers or email addresses.  Much of the product these private investigators sold consisted of stolen infant formula, and related products, which the investigators purchased from shoplifters.

9.      One of the private investigators hired by Safeway is a retired FBI agent who is licensed as a private investigator with the state of Washington (the "PI").  This PI created an OfferUp account to sell stolen formula and identify fences in the Pacific Northwest.  In January, 2019, the PI was contacted through OfferUp by a user named "Stephanie," later identified as Tran Nhat Bao NGUYEN ("NGUYEN"),[1] and the PI began to sell NGUYEN stolen baby formula.  From January 2019 to February 2020, the PI met almost monthly with NGUYEN to sell her stolen formula products.

---

[1] NGUYEN was tentatively identified by the telephone number that she used to communicate with the PI to set up the first transaction.  This identification was later confirmed by in-person meeting with NGUYEN and searches of public records and law enforcement databases.

Affidavit of Joshua Anderson - 3
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

10.     During the PI's in-person transactions with NGUYEN, and through messages on OfferUp and direct text messages exchanged with NGUYEN, the PI represented that the formula products he was selling to her had been stolen. Additionally, the products NGUYEN purchased from the PI contained store markers, tags, security strips, and "not for resale" stickers, which would indicate that the products were illegally obtained. Notwithstanding these indications that the products were stolen, NGUYEN continued to purchase them from the PI.  NGUYEN also stated to the PI that she purchases similar stolen products from other thieves in Washington.

11.     Publicly available information on the SUBJECT ACCOUNT and statements made by NGUYEN to the PI indicate that NGUYEN, along with others, has been exporting stolen formula products to Vietnam, where they are being resold.

**A.     Initial Transaction and Identification of NGUYEN**

12.     The PI was first contacted by NGUYEN on January 22, 2019, in response to an ad on OfferUp in which the PI offered several kinds of baby formula for sale.  The PI received a message from an OfferUp user named "Stephanie" and, after an initial exchange in which "Stephanie" offered to pay $10 per container of formula,[2] she asked the PI to provide his cell phone number so that they could communicate via direct text message rather than through the OfferUp platform.  Shortly afterwards, the PI received a text message from a telephone number associated with NGUYEN, and he agreed to meet with "Stephanie" to sell her formula products on January 26, 2019.

13.     On January 26, 2019, the PI met with NGUYEN and an unidentified woman in the parking lot of a public business in Tumwater, Washington.  NGUYEN introduced herself using her real first name, Tran.  During their conversation, the PI told NGUYEN that he had acquired some of the infant formula "at a great risk," including packages of a Similac product that NGUYEN purchased.  Many of the other containers that NGUYEN purchased

_____

[2] The retail value of baby formula is typically almost $40 per container.

Affidavit of Joshua Anderson - 4
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

bore anti-theft or "not for resale" stickers.[3]  NGUYEN paid $220[4] in cash for approximately thirty containers of infant formula, which had a retail value of approximately $1,322.

14.      On January 28, 2019, two days after their first meeting, the PI located the SUBJECT ACCOUNT, which had a profile name of "Tran Nguyen" and a profile picture of NGUYEN.  The SUBJECT ACCOUNT's page contained a photograph of the Similac product that NGUYEN had purchased from the PI.  The posting associated with the photograph, which was directed toward customers in Vietnam and written in both Vietnamese and English, states in relevant part, "all are available at my house in America…Contact order inbox me (sic) directly today or call my people's phone in Vietnam."

15.      Other posts on the SUBJECT ACCOUNT's page contained photographs of numerous other containers of infant formula.  The page also contained photographs that appear to depict formula products being shipped, including images of what appear to be formula containers that have been wrapped and placed in cardboard boxes, and an image of a commercial warehouse with numerous boxes stacked on several pallets, with Vietnamese text that translates to "Goods landing/docked" and "Last trip of the year."  This image has been shared by other Facebook users, including on an account with the profile name "Phoung Thao Le," with a caption stating that over five tons of goods had "arrived safely" by way of Haan Pro Logistics.  An earlier post on the SUBJECT ACCOUNT's page, dated November 7, 2018, mentioned an individual named Phung Thao Le, who was "responsible for sending goods quickly by air for me…."

B.      **February 2019 Transactions**

16.      On February 16, 2019, NGUYEN met with the PI at a public business in Federal Way, Washington, where NGUYEN purchased $3,769 worth of formula products for

---

[3] These stickers are difficult to remove, and they often state something along the lines of, "This item is for sale at Safeway store # XX."  These stickers also direct the reader to call a toll free number if the item is found for resale elsewhere.

[4] NGUYEN agreed to pay the PI $369 for the formula, but only had $220 on her during the transaction, and told the PI she would pay him the remaining money at a later date.

Affidavit of Joshua Anderson - 5
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

only $1,027. During this meeting, the PI told NGUYEN that he acquired his goods from various "suppliers" who had taken them from retail stores. NGUYEN told the PI that she started her business by selling infant formula to family members overseas, and that she now operated an expanded business out of her residence. NGUYEN complained that her profit margins were small, when she factored in the expense of shipping overseas. NGUYEN recalled that one of her suppliers "threatened to call the cops" on her because she offered such low prices to purchase the goods, but that she understood her suppliers' frustration since they were "taking all the risks." At the end of the transaction, NGUYEN told the PI to "keep it going" and stay in contact.

17.     Shortly after the February 16 meeting, the PI and NGUYEN arranged another transaction. On February 19, 2019, NGUYEN met with the PI at a public business in Auburn, Washington, where NGUYEN purchased $4,745 worth of formula products for $1,317 and loaded them into the back of her vehicle. NGUYEN told the PI that she was having difficulty exporting her goods via "air customs," but that she preferred to send formula to Vietnam by air because it arrived in better condition than when sent by ship. The PI reviewed the SUBJECT ACCOUNT later that evening and found that its user had posted a photograph of the back of NGUYEN's vehicle filled with the products that the PI had sold to her.

## C.     March, 2019 Transactions

18.     In late February, NGUYEN sent the PI various text messages requesting additional quantities of specific brands of formula that she needed for "overseas customers." This time, NGUYEN asked the PI to drop off the goods at her residence and provided him with her home address. NGUYEN instructed the PI to provide the goods to her father, with whom she would leave the payment.

Affidavit of Joshua Anderson - 6
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

19.     On March 2, 2019, the PI met with NGUYEN's father at her residence.[5]  The PI carried approximately forty-eight containers of formula from his car to the porch, and NGUYEN's father gestured for the PI to bring the formula into the living room.  Upon entering the home, the PI observed hundreds of containers of various types of formula stacked in the living area, including dozens of containers that the PI had previously sold to NGUYEN.  NGUYEN's father paid the PI $480 in cash for the goods, which had an approximate retail value of $1,887.   On March 4, another private investigator reviewed the SUBJECT ACCOUNT and observed photographs of formula containers bearing Fred Meyer anti-theft stickers, which were identical to those that the PI sold to NGUYEN on March 2.  The caption of this photograph read, in relevant part, "Next week the goods will arrive everyone.  Contact my aunt get milk."

20.     On March 9, 2019, NGUYEN contacted the PI via text message to see if he would be in the area soon.  The PI told NGUYEN that he had only a dozen containers for her because he had lost one of his suppliers, and NGUYEN responded: "Oh no.  To jail?"  The PI confirmed that his supplier would be in jail for a few weeks, and NGUYEN noted that suppliers had "been disappearing" lately.  Shortly after this exchange, NGUYEN sent the PI additional text messages requesting that he drop off additional product with her father at her residence.  On March 20, 2019, the PI returned to the home and delivered approximately twenty-five containers of formula, which he again helped to move into the living room.  Again, the PI observed at least one hundred containers of formula stacked in the living room, though he also observed that some of the prior product that he had delivered to NGUYEN was no longer in the residence.  The PI also observed a number of cardboard boxes stacked in the living and dining rooms.  NGUYEN's father paid the PI $240 in cash. The PI also provided approximately 80 canister of formula on consignment, with the agreement that

---

[5] NGUYEN's father does not speak English, so he called NGUYEN on a cellular phone when the PI arrived and placed her on speakerphone so that she could speak to the PI.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

NGUYEN would pay the PI once she sold the canisters. The approximate retail value of the formula sold and provided on consignment that day was $2,466.

21.     On March 15, 2019, the user of the SUBJECT ACCOUNT posted three photographs of at least six large cardboard boxes, possibly ready for shipping overseas, containing at least 72 canisters of formula. Two days later, the user of the SUBJECT ACCOUNT posted three photographs showing large pallets of formula with the caption "!! !! SOLD OUT !! !!"

**D.     April 2019 Transaction**

22.     In early April, 2019, NGUYEN again texted the PI and requested that he obtain certain brands of formula for her.  The PI responded that he was buying formula from "3 girls who hit it hard" and that he intended to "keep meeting them before they get in trouble."  NGUYEN asked the PI if he could obtain a large amount of Pediasure, as the containers were "smaller," inferring that they would be easier to steal.  The PI responded that his suppliers were "fearless" and did not care about the size of the containers, because they would "load up bags and just walk out" of the store with the merchandise.  NGUYEN replied, "oh my f….god….Can they do the same with Pediasure?"

23.     On April 10, 2019, NGUYEN sent a text message to the PI asking for a large quantity of an Enfamil product.  The PI suggested to NGUYEN that she post the request on OfferUp, and she responded that her business was best not conducted in public, because "U can get in trouble."  NGUYEN then told the PI that people were getting arrested for "buying boosters stuff."  Based on my training and experience, I know that "booster" is a term used to refer to an individual who regularly engages in shoplifting.  The PI then agreed to meet with NGUYEN on April 20, 2019 to deliver additional formula product.

24.     On April 20, 2019, the PI met with NGUYEN at her residence, where she purchased $6,678 worth of formula products for $1,490. [6]  At this meeting, the PI told NGUYEN that most of the formula he was delivering had been acquired by "the girls" he

---

[6] The total agreed upon price for the formula products was $1,867, but NGUYEN only had $1,490 at the time of the transaction and promised to pay the PI the balance at a later time.

Affidavit of Joshua Anderson - 8
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

had mentioned in his messages.  NGUYEN asked if the PI expected to continue working with these "girls," and the PI told her that he hoped to, but that he believed they had been arrested for all of the formula they were stealing from stores.  NGUYEN replied that she hoped the "girls" were okay because she appreciated the formula product that they supplied. The PI asked NGUYEN if she was still operating her export business out of her home, and NGUYEN confirmed that she was.

25.    On May 8, 2019, the PI informed NGUYEN via text message that the "girls" got arrested while they were "working."  NGUYEN asked the PI if he would still be able to "work," and the PI responded that the girls "kept hitting the same stores until loss prevention call the cops" and that they were "too scared to work now."   NGUYEN texted the PI that the girls were too "predictable," and then asked about the PI's supply.

**E.    June 2019 Transaction**

26.    After further text exchanges with NGUYEN, the PI returned to her residence on June 9, 2019 to deliver more stolen formula products; the total retail value for the product the PI delivered was $2,880.  NGUYEN provided the PI with $1,000 for the goods he provided that day, and for other goods he had provided to her on credit in the past. NGUYEN commented that it was becoming difficult to buy formula products because retail stores in the Seattle area had begun to lock up certain goods, including formula products. NGUYEN told the PI that she had found a supplier in the Port Orchard, Washington area who was getting formula from local stores because it was not secured.  NGUYEN added that she worked with someone who was helping her to ship merchandise to Vietnam, and that this individual had introduced her to another supplier in Edmonds, Washington, who maintained a large quantity of formula.  NGUYEN invited the PI into her home and, again, the PI observed a large quantity of formula in the living room.

27.    On June 10, 2019, the PI reviewed the SUBJECT ACCOUNT and found a posting from June 9, 2019 that appeared to be an advertisement for the online infant formula store "Baby Bliss."  The post included a photograph of bags of infant formula which appeared to be the same bags that the PI had sold to NGUYEN that day.  These photographs

1  were posted and Baby Bliss Da Nang's user account was tagged in this post, which stated
2  "Milk arrived in the village at Baby Bliss Da Nang and Baby Bliss Hanoi."

3  **F.    July 2019 Transaction**

4       28.    On July 13, 2019, NGUYEN met with the PI at her residence.  During that
5  transaction, NGUYEN paid $840 for formula products with a retail value of approximately
6  $3,359.[7]

7  **G.    September 2019 Transactions**

8       29.    Throughout August and into mid-September, 2019, NGUYEN sent the PI
9  numerous text messages inquiring whether he had large quantities of infant formula available
10 for sale.  PI responded he had been acquiring formula for NGUYEN from various sources
11 and would be able to provide her with 50 containers.  On September 14, 2019, the PI
12 delivered the products to her residence.  NGUYEN asked the PI where he had gotten the
13 containers, and he told her that he had gotten them from the same "girls" from whom he had
14 acquired a substantial amount of formula for NGUYEN in the spring of 2019.  NGUYEN
15 asked where the girls had been, and the PI told her that they had been in jail for a short time.
16 The PI then helped NGUYEN carry the products into her home and observed she was still
17 storing formula products in the front area of the home.  NGUYEN complained that her
18 business was slow because she had a number of competitors, whom she had seen shipping
19 products to Vietnam at the same business where she took her shipments.  NGUYEN said she
20 had been able to identify some of her competitors on social media and followed their sites
21 and postings, which targeted her Vietnamese customers.  Some of the product that the PI
22 provided to NGUYEN bore Fred Meyer security stickers, and NGUYEN told the PI that she
23 would remove the stickers and "exchange" the product at Target for replacement items with
24 newer labels.  NGUYEN paid the PI $560 in cash, which included a $10 tip for the PI, for
25 $1,617 worth of formula products.

26

27 ———————————

28 [7] The formula product that the PI sold to NGUYEN on July 13, 2019 was all product that was provided by Safeway and
   was not in fact stolen.

30.     On September 25, 2019, the user of the SUBJECT ACCOUNT posted pictures of boxes of an Enfamil product, including a picture where the boxes appear to be in the back of NGUYEN's vehicle.  In the posts, the user of the SUBJECT ACCOUNT represented that the product could be shipped from the United States to Vietnam if the purchaser ordered more than five boxes.

**H.     December 2019 Transaction**

31.     Throughout November and December, 2019, the user of the SUBJECT ACCOUNT posted images of formula products, including images of formula products packaged in cardboard boxes, with captions indicating that the goods were in the United States but available for shipping to Vietnam.

32.     In November, 2019, NGUYEN contacted the PI via text message to see if he could obtain 200 cans of a specific brand of formula for her.  The PI offered to provide NGUYEN with a different product, to which NGUYEN replied she had "600 cans in Vietnam [that] hasn't been able to process yet," which the PI understood to mean was stuck in customs in Vietnam.  On December 15, 2019, NGUYEN asked the PI via text message for more formula products and, later, asked him to meet her at her residence on December 22, 2019.  On December 22, 2019, PI arrived at the residence with containers of formula containing anti-theft stickers, stamps, security devices, and ink markings indicating that the containers were not for resale.  At this meeting, NGUYEN told the PI that some of the formula was destined for an "overseas customer," and the PI then helped NGUYEN carry the goods into her home.  In the living room, the PI observed a few hundred other containers of formula, stacked in three or four different areas.  NGUYEN paid the PI $940 in cash for approximately $2,678 worth of formula.  On December 28, 2019, NGUYEN sent a text message to the PI to advise him that she had shipped out some of the product, and to inquire whether the PI was "still working on the formula" that she needed.

**I.     February, 2020 Transaction**

33.     After a series of text exchanges between the PI and NGUYEN concerning the types and quantities of formula that the PI had available for sale, NGUYEN asked the PI to

Affidavit of Joshua Anderson - 11
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

deliver more formula products on February 2, 2020.   On that day, the PI met with NGUYEN at her residence and provided her with approximately 334 containers of formula, the total retail value of which is approximately $9,380.  The PI, NGUYEN, and an unknown male who came out of the home unloaded the goods from the back of the PI's vehicle and moved them into NGUYEN's residence.  Thereafter, the PI followed NGUYEN to two ATM machines where NGUYEN withdrew a total of $1,360, which she paid to the PI for some of the goods.  NGUYEN bought the rest of the product on credit and agreed to pay the PI half of the proceeds from her future sales.  The PI made audio and video recordings of this meeting, which were submitted to the FBI's evidence unit.  Additionally, another Special Agent and I conducted surveillance of this meeting between NGUYEN and the PI and took photographs and video of the transaction.

**J.      Search Warrant and Interview of NGUYEN at her Residence**

34.      On February 13, 2020, the Honorable Mary Alice Theiler, United States Magistrate Judge for the Western District of Washington, signed a search warrant authorizing the search of NGUYEN's residence for evidence of NGUYEN's international transportation of stolen formula products.  During the execution of the warrant NGUYEN was present at her residence and was interviewed.

35.      NGUYEN stated she began reselling infant formula in late 2018 or early 2019. NGUYEN told agents she purchased formula from various sources, including persons she contacted on OfferUp.   NGUYEN admitted to purchasing items she knew were stolen, including items she purchased from the above referenced Nate and Jessica, who had purchased them from other shoplifters.   NGUYEN said she knew the items were stolen because Nate and Jessica once said, "my people go and get it" and the products NGUYEN purchased from them were really beat up.  NGUYEN said she purchased much of her formula from a man she described as "the Portland Man who also knows Nate and Jessica." NGUYEN provided the phone number used by the Portland Man. Agents were able to confirm the phone number that NGUYEN provided was the phone number that the PI used in order to contact NGUYEN. NGUYEN explained that she was able to purchase formula

Affidavit of Joshua Anderson - 12
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

from the PI at approximately 82% off the retail value, because he lived with a person who worked at Albertsons.  NGUYEN also stated that she purchased some of the formula from the PI on consignment.   Additionally, NGUYEN stated she advertised her products on Facebook and, due to the lack of a local resale market, she shipped her products to customers and resellers in Vietnam.  NGUYEN explained she uses a certain cargo shipping company located in Kent, Washington, which specializes in shipping goods to Vietnam (hereinafter, "Cargo Company"). The Cargo Company's other customers also primarily ship infant formula to Vietnam.  NGUYEN said that the owner of the Cargo Company does not care where their customers acquired their products, and other customers are also likely shipping stolen infant formula to Vietnam.

36.     NGUYEN also stated she recognized the name of one of her Vietnamese customers on the search warrant; NGUYEN explained this individual referred her to other buyers in Vietnam. NGUYEN explained her customers in Vietnam typically pay for the goods by giving funds to NGUYEN's aunt, who lives in Vietnam.  NGUYEN's aunt in turn, provides the funds to NGUYEN's mother when she travels to and from the United States and Vietnam. Additionally, NGUYEN said she also gets paid from her customers in Vietnam through a system she referred to as "trading the money," which she explained to be similar to an unlicensed money remittance service designed to "avoid bank fees" and "unfavorable foreign exchange rates." The interviewing agents advised NGUYEN that utilizing unlicensed money remittance services is also a likely violation of federal law.   Notwithstanding NGUYEN's admissions, she substantially minimized her involvement with the PI and stated she only conducted three or four transactions and only purchased a total of $2,000-$2,500 from him.

37.     During the search, numerous containers of formula were located in NGUYEN's residence. NGUYEN directed the FBI to a certain stack of containers which she

identified as having purchased from the PI on "consignment," which the FBI seized.[8]
Regarding other stacks of formula in her residence, NGUYEN claimed she paid for those
items, or acquired them from persons other than the PI.  NGUYEN told the FBI that they
could take the additional items she paid for, provided that the government reimburse her for
them. As such, these additional contains were not seized by the FBI and were left with
NGUYEN.

38.     After NGUYEN's interview, and during the collection and seizure of the stolen
formula, the FBI warned NGUYEN to stop purchasing items she knew to be stolen. The FBI
also warned NGUYEN that because she knew the formula she exported in the past was
stolen, she should stop buying and selling infant formula all together, which NGUYEN
acknowledged.

**K.     Continued Illegal Conduct Post-Search Warrant and Interview**

39.     After the execution of the search warrant and the warnings from the FBI,
NGUYEN continued to engage in additional criminal activity.  The PI reported to the FBI he
had no contact with NGUYEN since the execution of the search warrant until he received
unsolicited texts messages from her in the beginning of March 2020.  During this exchange,
NGUYEN asked the PI to provide an update concerning certain brands of infant formula she
previously asked him to acquire.  Additionally, NGUYEN warned the PI to "be aware of
[his] surroundings."

40.     In July 2020, the PI reached out to NGUYEN regarding formula NGUYEN
previously purchased from the PI on "consignment."  NGUYEN replied she still had some of
the product which the PI could pick up and inquired whether the PI could sell her additional
formula.

41.     On August 9, 2020, the PI met with NGUYEN at her residence where the PI
observed between two to three hundred containers of formula stacked in various locations.

---

[8] Agents confirmed that these containers were in fact purchased by NGUYEN from the PI by comparing the containers
seized to the containers in photographs the PI took before selling the formula to NGUYEN and determining the
containers were identical.

Affidavit of Joshua Anderson - 14
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

During this meeting, NGUYEN purchased six new boxes of formula from the PI and returned several containers of formula the PI previously provided to her on consignment.[9] NGUYEN explained she sent the PI the text message warning him to "be aware of [his] surroundings" because the FBI searched her residence and interviewed her about the stolen formula.   NGUYEN said she was worried the PI also got into trouble because it had been so long since she had seen him.   NGUYEN said the FBI appeared to be unaware of a second cell phone NGUYEN used for her business, which she "destroyed" after the FBI's visit. NGUYEN also told the PI that during her FBI interview, she minimized her transactions with the PI and did not tell the FBI how the PI illegally obtained his formula.  Additionally, NGUYEN told the PI she had lied to the FBI about the quantity of the items she purchased from the PI on consignment, so that the FBI would not seize it all.  Furthermore, NGUYEN laughed and said she had told the FBI they could also seize the goods she claimed she had paid for, provided that the government reimburse her.  NGUYEN stated she was not concerned about what might happen to her as a result of the FBI's search and interview, because she has had several interactions with the local police, and they did not frighten her. NGUYEN concluded their meeting by asking the PI to acquire additional formula for her, and suggesting the PI change his telephone number, or get a new phone altogether, since the FBI was likely aware of it now.

42.    As part of the investigation, investigators obtained shipping records from the Cargo Company, which is located in Renton, Washington. I have reviewed those records and observed that from December 2018 until January 2021, NGUYEN utilized the Cargo Company on twenty-seven dates to ship boxes to Vietnam. I observed in nearly every shipping order that NGUYEN listed the description of the items she was shipping as various brands of baby formula. Investigators also obtained shipping records from a second cargo shipping company and observed that from November 2018 until February 2020, NGUYEN utilized this second cargo shipping company on thirty-nine dates to ship boxes to Vietnam.

---

[9] Several of the containers that NGUYEN returned to the PI were containers that NGUYEN had falsely told the FBI she had paid for in order to stop the FBI from seizing them.

Affidavit of Joshua Anderson - 15
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

## BACKGROUND – FACEBOOK SOCIAL NETWORKING SERVICES

43.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

44.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

45.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

46.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account

Affidavit of Joshua Anderson - 16
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

47.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, photographs and links that will typically be visible to anyone who can view the user's profile (subject to the privacy settings selected by the account user).

48.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos.  Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos associated with a user's account will include all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

49.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the

Affidavit of Joshua Anderson - 17
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

50.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

51.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

52.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

53.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

54.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

55.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

56.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is

Affidavit of Joshua Anderson - 18
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

57.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

58.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

59.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the

Affidavit of Joshua Anderson - 19
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

60.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

61.     On February 12, 2020, I sent preservation request to Facebook, and asked that the contents of the account associated with the SUBJECT ACCOUNT be preserved, under authority of Title 18, United States Code, Section 2703(f)(1), for a period of 90 days. On July 13, 2021, a second preservation request was sent to Facebook asking for the SUBJECT ACCOUNT to be preserved. During my investigation, I discovered that the SUBJECT ACCOUNT appears to be deactivated. While the account appears to be deactivated, I do not know if the account has been deleted or has simply been hidden from the public, which

Affidavit of Joshua Anderson - 20
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

would allow Facebook to still retain the data associated with the account. Additionally, because I do not know when the account was disabled, I do not know if the account information was preserved before it was disabled. Therefore, I am requesting this warrant because I believe it is possible that information can still be obtained from Facebook regarding the SUBJECT ACCOUNT. Additionally, I am only seeking data from Facebook from January 1, 2019 until February 28, 2020.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

62.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

//

//

//

### CONCLUSION

63.    Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.


Joshua Anderson, Affiant
Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN to before me this 12th day of August, 2021.


BRIAN A. TSUCHIDA
United States Magistrate Judge

Affidavit of Joshua Anderson - 22
USAO #2019R00793

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970